IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| ANTIONE J. WILLIAMS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No.:_____ |
| ) | JURY TRIAL DEMANDED |
| CITY OF FORT WORTH, ) | |
| JEFFREY HALSTEAD, individually ) | |
| and in his official capacity of Chief ) | |
| of Police of the Fort Worth ) | |
| Police Department, ) | |
| ) | |
| Defendants. ) | |

## PLAINTIFFS' ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff ANTIONE J. WILLIAMS files this original complaint and jury demand against Defendants CITY OF FORT WORTH ("Fort Worth"), JEFFREY HALSTEAD ("Halstead"), individually and in his official capacity of Chief of Police of the Fort Worth Police Department, alleging race discrimination, harassment, hostile work environment, and retaliation pursuant to (i) 42 U.S.C. §1981, (ii) Title VII of the Civil Rights Act of 1964, as amended, (iii) both prior statutes' anti-retaliation regulations and (iv) under 42 U.S.C.§1983. For cause of action, Plaintiff would show the Court as follows:

Plaintiffs' Original Petition                                                                                     Page 1

## I. PARTIES, JURISDICTION AND VENUE

1. Antione J. Williams is a male resident and citizen of Arlington, Tarrant County, Texas and performed work for Fort Worth in Fort Worth, Texas during the time period giving rise to the claims in this litigation.

2. Fort Worth is a municipality in Texas.

3. Halstead was, and at all times relevant to this action was, the Chief of Police at the Fort Worth Police Department.

4. This Court has jurisdiction to hear the merits of Plaintiff's claims under 28 U.S.C. §1331 and §1343(a). The court has original jurisdiction.

5. A substantial part of the events or omissions giving rise to Plaintiffs' claims happened within the Northern District of Texas and venue is proper in this District under 28 U.S.C. §1391.

## **VICARIOUS LIABILITY--RESPONDEAT SUPERIOR**

6. Whenever in this complaint it is alleged that the City of Fort Worth did any act or thing, it is meant that City of Fort Worth's supervisors, agents, servants, employees or representatives did such act and/or that at that time such act was done, it was done with the full authorization or ratification of the City of Fort Worth or was done in the normal and routine course and

scope of employment of the City of Fort Worth's supervisors, agents, servants, employees, or representatives.

7. The acts of management including but not limited to Chief Jeffrey Halstead, (non-African-American), were performed while in the employment of the City of Fort Worth, to further the City of Fort Worth's business, to accomplish the objective for which these supervisory employees were hired, and within the course and scope of that employment or within the authority delegated to these employees. Halstead was given supervisory authority over Plaintiffs. As such, Halstead was given complete day-to-day control over the work conditions, duties, and all other aspects of Plaintiffs' employment.

### III. FACTUAL BACKGROUND

8. The Fort Worth Police Department ("FWPD") hired Williams in 1999 as a Police Officer. Williams is a 14 year veteran of the FWPD. During his tenure, he has been assigned to various positions, including Patrol, Gang Enforcement, Detective, Intelligence Unit. After being promoted to the rank of Sergeant in 2010, on or about March 2013 Plaintiff was assigned as the Sergeant of the Special Operations Division on the Tactical Narcotics Team.

9. Up until about October 2013, while assigned to the Narcotics Division as a supervisor, Plaintiff's team executed a search warrant at a known drug location in Tarrant County where an undercover drug purchase was made by one of Plaintiff's undercover officer's Amy Bethel and a confidential informant. The purchase was for crack cocaine. Plaintiff and his team briefed at 1300 hours at the SWAT office located at 1000 Calvert St at the Ft. Worth Police and Fire Training Academy. There, the team went over everyone's assignments and convoy order for when we drove to the warrant location. Lieutenant Vance Keyes and Plaintiff rode in Plaintiff's city vehicle to the warrant location. Once everyone arrived at the location, Plaintiff and his team staged to wait until SWAT gave the signal that it was all clear for the team to enter the residence to begin searching. The named suspect was not present at the time of the search warrant execution; therefore SWAT called the location safe.

10. Once inside of the residence, Plaintiff's assignment was to photograph any and all evidence prior to it being moved from its original location. As Plaintiff was taking pictures and assisting with the search, one of Plaintiff 's officers called for Plaintiff to walk to the back bedroom to look at what is believed to be the suspects shoe collection. Plaintiff walked to the bedroom that appeared to be the room that the suspect was

living out of based on personal pictures and clothing. Officer's were searching the room and noticed that the suspect had over 50 pairs of tennis shoes in boxes. Officers began removing the shoes in order to check to see if any drugs were being hidden inside of the shoes or the shoeboxes. One of Plaintiff's officers was looking at a pair of shoes and Plaintiff made the comment to his lieutenant, who was at the location, that we could use the shoes for dressing up whenever we worked undercover. Lt. Vance Keyes then tells Plaintiff, "Hell yeah, take all of that shit, he's a drug dealer." Plaintiff asked a second time and Lt. Vance Keyes said that it was alright. Officer Terrence Horn, who was also in the room when Lt. Vance Keyes made the statement, took two pairs of shoes to Plaintiff's car. Later, Plaintiff also took two pairs of shoes to his vehicle along with a Grand Theft Auto video game. These items were cleared by Plaintiff's Lieutenant for immediate use

11.   Lt. Keyes and Plaintiff then left the warrant location in the same vehicle, which had the shoes sitting in the backseat. Plaintiff later dropped Lt. Keyes off at the Police Academy. After a series of meetings, Plaintiff drove to the office and remained there for the rest of his shift around 9 pm. However, while still at the office, Officer Lorenzo Edwards contacted Lt. Keyes around 8:30 pm and told him that he saw Plaintiff take

shoes from the search warrant executed earlier that day. These were, of course, the same shoes that Lt. Keyes had already approved of Plaintiff taking. Lt. Keyes then contacts Captain Gillespie and advises him of what Plaintiff had done and then Lt. Keyes contacted the Special Investigations Unit and ordered all members of Plaintiff's team not to make contact with Plaintiff and to report to the Special Investigations Unit first thing in the morning on October 14th. Prior to leaving the office that night, Plaintiff spoke with both Officer Edwards and Officer Reginald Traylor for more than 15 minutes and neither officer asked Plaintiff anything about the shoes. Once Plaintiff left the office, he received a phone call saying that assistance was needed in another unit with making a drug buy.

12. Plaintiff remained on call until 2am that morning. Plaintiff had to be at work early the next morning, so he went home with the tennis shoes still in the backseat of the car. Once he arrived, Plaintiff removed the boxes of shoes from his vehicle and placed them in the laundry room/kitchen with the rest of his gear. This was Plaintiff's normal routine because he parked the car on the street in front of his house and he was fearful that someone would burglarize the vehicle. Once the shoes were inside of the house, Plaintiff's wife saw the boxes of shoes the next morning on October 14th and thought they were Plaintiff's shoes and as a

result she took the boxes of shoes and moved them to the bedroom from the original location.

13. The next morning, as was Plaintiff's normal routine, he loaded up his city vehicle with his police gear then headed to work. Plaintiff was almost at his office whenever he realized that he forgot to grab the boxes of shoes to bring to work. However, it wasn't a priority for Plaintiff at that moment since he had time to get the shoes later and figured that he would grab the shoes later in the day. As Plaintiff was driving home that afternoon, he received a phone call from Lieutenant Vance Keyes advising him that Special Investigations needed to talk to Plaintiff and Lieutenant Keyes was unsure as to what it concerned.

14. Detective Felecia Yates interviewed Plaintiff that afternoon around 4pm. She advised Plaintiff that she just wanted to ask him some questions about his job and what it is that Plaintiff does in Narcotics. Plaintiff was never informed that he was under investigation for Theft. Plaintiff later learned that that's a tactic that Special Investigations uses in order to gain consent from officers to talk during an investigation because Special Investigations know that if they read the Miranda Warning that they wouldn't get much cooperation out of officers. While Plaintiff was being interviewed, he received a phone call from his wife asking if

everything was okay because our neighbor called her and said that there were several police cars in front of Plaintiff's house and police officers in plain clothes walking in Plaintiff's yard and taking pictures of Plaintiff's house.  When Plaintiff asked Detective Yates why officers were at his house, she advised that she wrote a search warrant for the shoes.  Plaintiff advised Detective Yates that the shoes were still at his house and had she asked him, instead of drafting a warrant, he would have gladly brought them to her.

15.   At the conclusion of Plaintiff's interview with the Special Investigations Unit, he was sent to Internal Affairs where he was stripped of his badge and gun and placed on restricted duty by Sergeant Steven Benjamin.  Sergeant Steven Benjamin was assigned as the Internal Affairs Investigator for Plaintiff.  Plaintiff Steven Benjamin and Plaintiff have had an unpleasant history stemming from an argument over the wrongful Internal Affairs Investigation led by Defendant Chief Halstead against the executive officers of the Fort Worth Black Law Enforcement Officers Association which Plaintiff was the 2nd Vice President and a member of the executive board.  The discriminatory and retaliatory actions of the FWPD were so out of control that Plaintiff as well as other leaders of the Fort Worth Black Police Officers Association filed complaints alleging

race-based discriminatory and retaliatory treatment and harassment by Chief Halstead and other supervisory and senior level officers within the Department.

16. On Monday, October 21, 2014 Plaintiff learned that an arrest warrant had been issued for his arrest. Neither Sergeant Benjamin, Detective Yates nor anyone else from the Internal Affairs Division or the Special Investigations Unit ever contacted Plaintiff. The very next day on Tuesday, October 22, 2014, Plaintiff's door bell rang and he saw a camera man directly across the street from his house and a news reporter at his front door. Plaintiff was eventually terminated in May 2014 .

17. Prior to this, other non-African American Officers who were similarly situated to Plaintiff were treated differently. There are two cases where white officers took evidence home or kept for personal use but they were never arrested or even charged with a criminal offense. Under Chief Halstead's tenure as chief, African American Officers have been charged with crimes while white officers who were alleged to have done the same thing were given little to no discipline. For example, Sergeant Tyson Cheek took a blender from a warrant location and took it to his office and kept it there for weeks and used it at his desk. Whenever it was reported, he was only transferred from his unit but was never terminated or charged

with a crime. In another example of disparate treatment, Sergeant Steven Benjamin, Plaintiff's internal affairs Investigator, was suspended for 16 days without pay for taking drugs from a warrant location home. Sergeant Benjamin was not charged with a crime or terminated. Both of these cases were handled administratively but Plaintiff was terminated, charged with a criminal offense which he was found not guilty of and Plaintiff's information was leaked to the media who in turn plastered Plaintiff's home address and picture all over the news. Keeping in mind that for years, Plaintiff was an undercover officer, his safety as well as the safety of his family was really placed in jeopardy for Defendant.

18. During Plaintiff's criminal trial for Theft by a Public Servant, Detective Yates admitted that she purposefully left out the fact that Plaintiff told her that his Lieutenant , who was at the warrant location, gave him permission to take the items in order to get the Judge to sign the search warrant. Moreover, according to Texas Code of Criminal Procedure §59.03 subsection C, Plaintiff had 72 hours to seal any evidence and place it in the property room. More Importantly, Defendant's own Standard Operating Procedures gave Plaintiff 5 working days to complete all seizure paperwork. Plaintiff was not even given 24 hours before search warrants were issued.

19. Plaintiff's complaints as well as other African American Officers who had previously complained about discrimination and retaliation against the City had gone unaddressed within a timely manner, as a direct result, the City retained Coleman & Associates to perform an independent investigation of all of the complaints in the Department.

20. The Coleman Report (Coleman) was released in late 2014. After a thorough investigation, Coleman found that the FWPD had tolerated and allowed a hostile work environment over a three year time period that was based in part on race and retaliation for Plaintiff's prior complaints of race discrimination and retaliation. This was a highly publicized report that generated many news reports. It also resulted in the extraordinary measure of Chief Halstead publicly apologizing for the racial and retaliatory animus that was so pervasive within the Department. In the video that was posted on YouTube, Chief Halstead admitted that African American Officers generally were discriminated against because of the color of their skin.

21. It was further discovered through the Coleman Report that Chief Halstead order a white police officer to file a made-up complaint

with Internal Affairs that African American police officers had violated an Order, even though there was no supporting documentation or validity to the fact that there was a violation of the Order. Moreover, Chief Halstead had already been made aware by Internal Affairs that there was in fact no violation of the Order. Chief Halstead ordered this Internal Affairs investigation because the officers were African American.

22. The continuing race discrimination, harassment, and retaliation have taken a severe emotional toll on Sergeant Williams and his family. The emotional distress and mental anguish he has suffered is significant to say the least.

### IV. CAUSE OF ACTION: SECTION 1983 – RACE DISCRIMINATION, HARASSMENT, HOSTILE WORK ENVIRONMENT, AND RETALIATION

23. Plaintiff re-alleges and incorporates the allegations in paragraphs 1-22 as if fully stated herein.

24. All conditions precedent to the filing of this action has occurred or has been fulfilled.

25. Plaintiff was an employee of Fort Worth.

26. Defendants willfully discriminated, harassed, created and tolerated a hostile work environment, and retaliated against Plaintiff as

described above.

27. As a result of the unlawful discriminatory and retaliatory actions of Defendants as described above, Defendants have violated the provisions of Section 1983 in that acting under color of law, they, jointly and/or severally, deprived Plaintiffs of his rights, privileges, and/or immunities as provided by the Constitution of United States and its Laws.

28. Defendants acted with intent to violate or with reckless indifference to Plaintiff's clearly established rights under the First and Fourteenth Amendments.

29. Plaintiff has suffered, and will continue to suffer, actual damages, compensatory damages, emotional distress, loss of reputation, and humiliation, for which he hereby seeks to recover.

30. Defendants' conduct constitutes a willful violation of Section 1983, entitling Plaintiff to recover punitive damages.

31. Plaintiff also seeks attorneys' fees, reasonable expert witness fees, and costs of the action.

## V. CAUSE OF ACTION: SECTION 1981 AND TITLE VII–
## RACE HARASSMENT & DISCRIMINATION PURSUANT TO 42 U.S.C. §1981 AND TITLE VII

32. Plaintiff repeat and re-alleges by reference each and every allegation contained in the paragraphs above and incorporate the same herein as though fully set forth.

33. Defendant Fort Worth, through its agents, supervisors, or employees violated Plaintiff's civil rights in violation of 42 U.S.C. §1981 and Title VII, by intentionally interfering with Plaintiff's performance of his employment because of his race.

34. This intentional interference consisted of discrimination of a continuous nature.

35. Defendant Fort Worth through its agents, supervisors, or employees discriminated against Plaintiff which led to the loss and impairment in whole or part, of the wages, benefits, privileges, and terms and conditions of the Plaintiff's employment.

36. The above-described acts of Defendant Fort Worth caused Plaintiff substantial injury and damage.

**B.     RETALIATION PURSUANT TO 42 U.S.C. §1981 & TITLE VII**

37.     Plaintiff repeat and re-alleges the allegations contained in the paragraphs above and incorporate the same by reference as though fully set forth herein.

38.     After complaining to management of maltreatment, Plaintiff was subsequently and repeatedly retaliated against for his complaining about such discrimination.

39.     As herein alleged, Defendant Fort Worth illegally retaliated against Plaintiff because he opposed discrimination and reported same. Defendant Fort Worth had no legitimate business reasons for any of such acts. Each act of retaliation is in violation of 42 U.S.C. §1981 and Title VII. As a direct and proximate result of Defendant's willful, knowing, and intentional discrimination and retaliation against Plaintiff, he has suffered and will continue to suffer extreme and severe mental anguish and emotional distress. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

40.     The above-described acts on Defendant's part were undertaken in violation of 42 U.S.C. §1981 and Title VII, and proximately caused Plaintiff substantial injuries and damages.

## VI. JURY DEMAND

41. Plaintiff hereby demands a jury trial on all issues, claims, actions, and defenses in this case.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that Defendants be summoned to appear and answer, and that on final trial, judgment be granted against Defendants, jointly and severally, awarding Plaintiff the following:

- a. Actual damages;

- b. Compensatory damages, including damages for emotional distress, loss of reputation, and humiliation;

- c. Punitive damages;

- d. Injunctive relief enjoining Defendants from engaging in unlawful practices in violation of Section 1983;

- e. Prejudgment and post-judgment interest, in the maximum amount allowed by law;

- f. Attorneys' fees, expert fees, and costs of suit; and

- g. Such other and further legal and equitable relief to which Plaintiff may be justly entitled.

Dated: March 5, 2015

                              Respectfully submitted,

                              By: /s/ Ray Jackson
                                  **RAY JACKSON**
                                  THE JACKSON LAW FIRM
                                  SBN 00797754
                                  3838 Oak lawn Ave., Ste1350
                                  Dallas, TX 75219
                                  214.651.6250 (Office)
                                  214.651.6244 (Facsimile)
                                  rjackson@jacksonfirm.net

                                  **ATTORNEYS FOR PLAINTIFF**